## City of Chicago v. Timothy Cronin.

1. MASTER AND SERVANT—*Where There is a Departure from Ordinary Methods Ordered by the Foreman.*—Where a foreman, acting as vice-principal and assisting his workmen in lowering a heavy sewer pipe into an open trench, orders a departure from the usual manner of lowering such pipe by letting it fall down of its own weight without giving employes at work in the trench notice and an opportunity to escape, and one of them is injured in consequence, his principal will be liable, although in assisting to lower the pipe the foreman was acting as a fellow-servant.

Trespass on the Case, for personal injuries. Appeal from the Superior Court of Cook County; the Hon. JOSEPH E. GARY. Judge, presiding. Heard in this court at the March term, 1900. Affirmed. Opinion filed October 29, 1900.

Statement.—This is an appeal from a judgment in favor of appellee and against appellant for the sum of $20,000. The appellant was laying iron water pipes on the north side of Twenty-third street in the city of Chicago. One Frank Veruskey was the foreman in charge of the work and had under him and subject to his directions a gang of men which included appellee. A ditch or trench about five and one-half or six feet deep and about two and one-half feet wide was excavated on the north side of the street, and the earth taken from the excavation was thrown up on the north side of the excavation, forming a bank of between five and six feet in height, so that from the top of the bank to the bottom of the ditch was between ten and eleven feet. Cronin, the appellee, is a caulker, and his duty was to connect and caulk the joints of pipe. In the morning of October 22, 1894, Veruskey, the foreman, ordered appellee to go down into the ditch to do some work in connection with the laying of the pipe. Dineen, another caulker, and Fitzgerald, a helper, went down with him. When appellee went down into the ditch there was no pipe lying on the north bank of the ditch. While appellee, Dineen and Fitzgerald were doing the work in the ditch, in obedience to

Veruskey's order, there was a piece of iron pipe about twelve feet in length, six inches in diameter and weighing about 450 pounds, placed on top of the loose bank of earth on the north side of the ditch. Immediately after the completion of the work which appellee had been sent into the ditch to do, Veruskey, who had hold of the east end of the pipe, hallooed to Halpin, a laborer under Veruskey, who had hold of the west end of the pipe, "Let her go." This was the first intimation the men in the ditch had that a pipe was to be lowered into the ditch while they were in it. Appellee testified that when he heard the order "Let her go," he cried out, "For God Almighty's sake, Halpin, hold on to it." Fitzgerald testified that Cronin cried out, "For God Almighty's sake, don't kill us." The evidence shows that appellee could not get out of the ditch in time to escape the danger. When Veruskey said "Let her go," he let go his end of the pipe. Halpin, who was holding the other end, held it for an instant after Veruskey let go, but it slipped from him, tearing the skin from his hands. The end of the pipe struck appellee in the back and he knew nothing more until after he had been removed to the sidewalk. The evidence shows that the usual manner of lowering pipes such as that in question into a ditch, is by ropes, a rope being attached to each end of the pipe, and that Riley, one of the men engaged in the work, and who helped to put the pipe on the bank, brought a rope and laid it alongside the pipe, and that Veruskey was near the pipe when the rope was left there and must have seen it. No attempt was made to use the rope.

Appellee was injured about ten o'clock A. M. He was taken to his home and laid on a couch, and Dr. Egan attended him about noon of that day. Dr. Egan testified substantially as follows:

"Am a physician and surgeon; have practiced eighteen years in the city of Chicago; am a graduate of Rush Medical College; in general practice. I know Timothy Cronin. I remember the 22d day of October, 1894. About noon on that day I was called to his house. Cronin was in bed. I took his clothing off and examined him. I found that he had

no use of himself and was not able to use himself at all—helpless. He had a large swelling on his back near the lower part of the spinal column and up toward the middle of the back. The swelling was very large. All the soft parts were swollen. I applied evaporating lotions and tried to control the pain he was suffering from. Applied the lotions for a month. A deep abscess formed in about a month that I had to open and drain. It was raised upward about four inches from his back. The swelling extended over the whole back. There was no tearing, more crushing, and a sort of pulpy mass. All the tissues of the back were crushed. The sacrum bones were crushed. I opened the abscess and drained it. I put leather tubes in his back; I had three part of the time. They were put in to allow the matter to escape between dressings. I washed the wound out every day and removed the tubes and applied them again. About three months from the time of the injury I removed a portion of the bone of the spinal column. The spinal column in a man of his age is a solid mass. There had been five originally, but they got united into one. It was from this point that the sequestrum came away; I had to scrape some of it off and some of it to lift out with forceps. An injury such as Cronin suffered would have an effect on all the tissues and all the viscera that the nerves go to supply. The injury affected his lower limbs, his kidneys and his bladder. It produced a disability of the parts. He can not use them only partly; his legs are stiff, the nerves are contracted that go up to supply them; he can not retain his water. The kidneys were injured at the time he received the original injury, and he can not retain his water since; the bladder is at fault when he can not retain his water. He can not digest his food properly. For the first six months after the injury I treated Cronin every day and sometimes twice a day; I dressed him every day. About a month after he was injured I put in the tubes to draw away the matter that came in the meantime. The tubes were in there from then until perhaps March, 1897. I washed out the wound every day. After I stopped using the tubes I got the wound washed and dressed antiseptically and put in antiseptic gauze in place of tubes. Saw his back yesterday. There wasn't any difference in his back yesterday from what it has been all the time. There is a large hole there, as large— my fist could be buried in it. It is entirely dried up now. From about March, 1897, there has been no suppuration from it. The hole is on the spinal column.

I don't think he will ever get any better. Cronin was confined to his bed about ten months. After he got up he had to be assisted along from one chair to another; from one seat to another. He is not able to perform any physical, manual labor. I attended Cronin well onto a thousand times since his injury. The usual and customary charge by surgeons for the amount of services rendered to him is seventeen hundred dollars."

On cross-examination this witness testified that he removed considerable bone from appellee—about a hundred small pieces about the size of a large grain of gravel, and about fifteen larger pieces, some of them about two inches long and a quarter inch thick.

The testimony of Dr. Egan is corroborated by that of appellee. The latter says, among other things:

"Before this accident occurred I was a strong, healthy man, never sick a day in my life. Since the accident I haven't got a day's health since the day I was hurt. I have got hemorrhage of the bowels; my kidneys are weak. I have got no control of my water in any form. I sit in a chair and my water will go from me and I don't know it. My lower limbs are all the time numb; not all the time exactly, sometimes they are fair, more days they are no good. One day one leg is lame, the other day the other leg is lame, and I can not go without a cane; I can not go around the house without it. I am thirty-three years of age. * * * I weighed about 225 pounds before the accident. Since that time I weighed about 165 or so."

Appellant introduced no evidence as to appellee's injuries.

ANDREW J. RYAN, MATTHEW P. BRADY and JAMES J. KELLY, attorneys for appellant.

JAMES MAHER, attorney for appellee; A. W. BROWNE, of counsel.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

It is contended by appellant's counsel that Veruskey was a fellow-servant of appellee and that the court should have

so held as matter of law, and should have instructed the jury to find the defendant not guilty. In this view we can not concur. Appellant's foreman and temporary vice-principal, exercising the power vested in him as such, ordered appellee into the trench, superintended the laying of the pipe on the loose bank of earth on the north side of the trench, and ordered Halpin to let the pipe go. Also, in his character as foreman, he ordered a departure from the usual manner of lowering the pipe, namely, using ropes. His order was to let go, let it fall of its weight. Veruskey contradicted appellee's witnesses on material points, but we think the jury were justified in disbelieving him, as they apparently did. Had it not been for these things, done by Veruskey's express authority, the probability is that the accident would not have happened.

In Pittsburg Bridge Co. v. Walker, 170 Ill. 550, the appellee and others were engaged in removing heavy pieces of iron frame-work intended to be used in constructing a bridge across the Chicago river, from the bank of the river to the place where the frame-work would be needed, and in the process of removal it was necessary for the safety of the employes that a tag line should be attached to the frame-work to steady and control it. One Farnsworth, who was superintending and directing the work for the bridge company, refused and neglected to attach the tag line, but undertook to control the frame work with his hands, which he was unable to do, in consequence of which the frame-work swung around and struck and injured the appellee. It was contended that Farnsworth, in assisting to move the frame-work, was a fellow-servant of appellee, but the court held against this contention, saying:

" The evidence tended to show Farnsworth, in his position as vice-principal, ordered the use of the tag line dispensed with, and adopted as a substitute the plan of attempting to control the swaying frame-work by seizing it with his hands and holding it in proper position by his unaided strength, and that the primary cause of the injury received by the appellee was the exercise by Farnsworth of authority conferred upon him by the master to order, direct

and control the operation of moving the frame-work from its position on the bank to the place where it was needed to be placed in the bridge, without using the tag line."

In the same case the court quotes with approval the following from the opinion in C. & A. R. R. Co. v. May, 108 Ill. 288.

" The mere fact that the servant exercising such authority sometimes, or generally, labors with the others as a common hand, will not of itself exonerate the master from liability for the former's negligence in the exercise of his authority over the others. * * * When the negligent act complained of arises out of and is the direct result of the exercise of the authority conferred upon him by the master over his co-laborers, the master will be liable. In such case he is not the fellow-servant of those under his charge with respect to the exercise of such power, for no one but himself, in the case supposed, is clothed with authority to command the others."

Appellant, by its vice-principal, ordered appellee into the trench, and appellant, whose duty it was to maintain the trench in a reasonable safe condition while appellee was in it, ordered, by its vice-principal, the pipe to be let fall into the trench. Under these circumstances, appellant can not escape liability, even though it should be held that Veruskey, in assisting to lower the pipe, was acting as a fellow-servant. Met. El. R. R. Co. v. Skola, 183 Ill. 454.

The question whether appellee and Veruskey were fellow-servants, was submitted to the jury, under instructions much more favorable to appellant than, in our opinion, it was entitled to; and the jury found, very properly, as we think, that they were not fellow-servants. It is urged that the judgment is for an excessive amount, and that for this reason it should be reversed. In view of the evidence in regard to appellee's injuries set forth in the preceding statement, we can not so hold. The judgment will be affirmed.